

**IN THE**
**TENTH COURT OF APPEALS**

————————

**No. 10-15-00192-CV**
**No. 10-15-00193-CV**

**IN THE INTEREST OF A.C., A CHILD**
**IN THE INTEREST OF D.C. AND E.C., CHILDREN**

————————

**From the 272nd District Court**
**Brazos County, Texas**
**Trial Court Nos. 14-002213-CV-272 and 13-002954-CV-272**

————————————————————————————————————————

## MEMORANDUM  OPINION

————————————————————————————————————————

In two issues in both appellate cause numbers, appellants, Er.C. and J.C., challenge

the trial court's judgment terminating their parental rights to A.C., D.C., and E.C.

Because we conclude that the evidence presented is legally and factually sufficient to

support a predicate ground for termination, and because we conclude that the Barretts,

the foster family, had standing to file a petition in the trial court with respect to A.C., we

affirm.[1]

---

[1] As this is a memorandum opinion and the parties are familiar with the facts, we only recite those facts necessary to the disposition of the case.  *See* TEX. R. APP. P. 47.1, 47.4.

# I. SUFFICIENCY OF THE EVIDENCE

In their first issue, appellants contend that the evidence supporting the predicate termination grounds—subsections (D) and (E) of section 161.001 of the Texas Family Code—is legally and factually insufficient because the Department failed to present evidence of a course of conduct. *See* TEX. FAM. CODE ANN. § 161.001(1)(D)-(E) (West 2014).

## A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397, 71 L. Ed. 2d 599 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002); *see In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("But this Court has stated that 'the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993) (citations omitted))). In a termination case, the petitioner seeks not only to limit parental rights but to eradicate them permanently by divesting the parent and child of all legal rights, privileges, duties, and powers normally existing between

them, except for the child's right to inherit. Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *See Holick,* 685 S.W.2d at 20-21.

In an involuntary termination proceeding brought under section 161.001 of the family code, the Department must establish: (1) at least one ground under subsection (1) of section 161.001; and (2) that termination is in the best interest of the child. Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tᴇx. Fᴀᴍ. Cᴏᴅᴇ Aɴɴ. §§ 161.001, 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm

belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all contrary evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* In other words, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is within the province of the factfinder. *Id.* at 573-74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are reasonable. *Id.* at 573.

In reviewing for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) and that the termination of the parent-child relationship would be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1)(D)-(E); *see In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

reasonably have formed a firm belief in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.*, 209 S.W.3d at 108.

**B.**     **Applicable Law**

Here, appellants' parental rights were terminated pursuant to subsections (D) and (E) of section 161.001 of the Texas Family Code, which required a finding that appellants "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* TEX. FAM. CODE ANN. § 161.001(1)(D)-(E). As noted earlier, appellants assert that the Department failed to present evidence of course of conduct. Appellants did not challenge the best-interest determination.

Sections 161.001(1)(D) and (E) both require a finding of endangerment. *See id.* § 161.001(1)(D)-(E). To endanger means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *See Boyd*, 727 S.W.2d at 533.

> When termination of parental rights is based on section D, the endangerment analysis focuses on the evidence of the child's physical environment, although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings

threaten his or her well-being. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Section D permits termination if the petitioner proves parental conduct caused a child to be placed or remain in an endangering environment. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, pet. denied).

It is not necessary that the parent's conduct be directed towards the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477. Conduct that demonstrates awareness of an endangering environment is sufficient to show endangerment. *Id.* (*citing In re Tidwell*, 35 S.W.3d 115, 119-20 (Tex. App.—Texarkana 2000, no pet.) ("[I]t is not necessary for [the mother] to have had certain knowledge that one of the [sexual molestation] offenses actually occurred; it is sufficient that she was aware of the potential for danger to the children and disregarded that risk by . . . leaving the children in that environment.")). In considering whether to terminate parental rights, the court may look at parental conduct both before and after the birth of the child. *Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no pet.). Section D permits termination based upon only a single act or omission. *In re R.D.*, 955 S.W.2d at 367.

*Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see, e.g., In re T.R.L.*, No. 10-14-00290-CV, 2015 Tex. App. LEXIS, at **11-12 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *Dupree v. Tex. Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ); *see also In re T.R.L.*, 2015 Tex. App. LEXIS 2178, at *12.

Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see* TEX. FAM. CODE ANN. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

*In re T.T.F.*, 331 S.W.3d 461, 463 (Tex. App.—Fort Worth 2010, no pet.).

## C.    Discussion

At the outset, appellants assert that the Department was required to present proof of course of conduct for not only subsection (E), but also subsection (D).[2] Relying on cases from other courts, appellants contend that "course-of-conduct" analysis should be used "when considering the sufficiency of the evidence to support a finding under Subsection (D)." *See In re S.D.H.*, 591 S.W.2d 637, 638 (Tex. Civ. App.—Eastland 1980, no writ); *Crawford v. Crawford*, 569 S.W.2d 505, 507 (Tex. Civ. App.—San Antonio 1978, no writ); *H.W.J. v. State Dep't of Pub. Welfare*, 543 S.W.2d 9, 11 (Tex. Civ. App.—Texarkana 1976, no writ); *see also In re S.R.*, 452 S.W.3d 351, 360-61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Because the inquiry under both subsections D and E includes the conduct of the parent, evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-

---

[2] A course of conduct requires more than a single act. *See In re D.P.*, 96 S.W.3d 333, 338 (Tex. App.—Amarillo 2001, no pet.).

being of the child."). However, as mentioned above, this Court and many others have stated that subsection (D) permits termination based on a single act or omission. *See A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *Dossey*, 325 S.W.3d at 721; *In re L.C.*, 145 S.W.3d 790, 796 (Tex. App.—Texarkana 2004, no pet.); *see also In re E.M.*, No. 10-14-00313-CV, 2015 Tex. App. LEXIS 5490, at *17 (Tex. App.—Waco May 28, 2015, pet. filed); *In re T.R.L.*, 2015 Tex. App. LEXIS 2178, at **11-12; *In re T.C.C.H.*, No. 07-11-00179-CV, 2011 Tex. App. LEXIS 10134, at *16 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.); *In re V.G.*, No. 04-08-00522-CV, 2009 Tex. App. LEXIS 6929, at *8 (Tex. App.—San Antonio Aug. 31, 2009, no pet.) (mem. op.); *In re C.G.*, No. 13-05-063-CV, 2006 Tex. App. LEXIS 679, at *13 (Tex. App.—Corpus Christi Jan. 26, 2006, no pet.) (mem. op.). It appears that the majority of our sister courts have determined that subsection (D) permits termination based on a single act or omission.

That said, we recognize that the petition for review in the *S.R.* case from the Fourteenth Court of Appeals was denied, meaning the Texas Supreme Court did not take the opportunity to modify the language used by the Fourteenth Court of Appeals with respect to subsection (D). *See In re S.R.*, 452 S.W.3d at 360-61. On the other hand, the Texas Supreme Court has also denied the petitions for review in *Jordan* and *R.D.* *See Jordan*, 325 S.W.3d at 721; *see also In re R.D.*, 955 S.W.2d at 367. Moreover, in most of the cases cited above, no petitions for review were filed in the Texas Supreme Court. Without explicit guidance from the Texas Supreme Court on this issue, we are inclined to follow

our precedent and that of the majority of our sister courts regarding the quantum of proof required to establish termination under subsection (D).

Nevertheless, despite our disinclination to require proof of course of conduct for subsection (D), we note that the record in this case contains ample evidence that appellants engaged in a course of conduct that endangered their children under either subsection (D) or (E). In other words, even if we were to follow appellants' logic, the record contains sufficient evidence to support the predicate grounds for termination. In support of our conclusion, we highlight the following evidence.

On October 16, 2013, the Department first investigated appellants' apartment, which was determined to be unsafe for their children. After some prodding, appellants agreed to allow the apartment to be cleaned. However, the Department received another report and returned to appellants' apartment on November 15, 2013. On this occasion, City of Bryan Fire Marshal Fred Taylor was called to the scene. In describing the conditions of appellants' apartment, Taylor stated the following:

> The apartment was I guess a good word would be disarray, very—it was very messed up. Best I recall, there was some holes in the walls. There was trash everywhere. I don't remember being able to walk to the kitchen without having to climb over or step over items.
>
> Going upstairs—and I don't know how much you want me to get into this right now, but going upstairs the bedroom that the boy was in, and I don't remember which—their names, we went to open the door. The door was stuck. When I pushed harder or forced the door, it come open. It was a—I don't remember it being on the hinges. There was not a lot of furniture in that—that room. The bedroom for the family, or what I took was the bedroom, it had a bed in it. The baby bed was off to one side. It was just

full of trash. There was a –best I remember, there was either a computer or a TV there with like a game player on it. Something led me to believe they'd been playing computer games.

The apartment stunk, best—in the best of my recollection. There was cats in—all in there. It smelled as—like cats would smell or dogs would smell, urine and feces.

Taylor also mentioned being concerned about an open window in the room with the broken door. Taylor feared that no one kept an eye on the child that resided in that room and that the child could easily fall out of the window. Additionally, Taylor expressed concern about the open voids in the walls as being a fire hazard, especially considering the voids were filled with trash. The apartment did not have any smoke detectors, and the food pantry was full of mold that appeared to be black. Later, Taylor recalled that the apartment had bugs. According to Taylor, appellants' living conditions posed a danger to children. In fact, Taylor stated that the conditions at a homeless shelter would have been better than appellants' apartment.[3]

Elisabeth Grissom, a supervisor for the investigative unit for CPS, testified that the Department received information in a November 2013 report that J.C. had been arrested for assaulting Er.C. with a knife. The report also stated that J.C. had attempted suicide before she was arrested for the assault on Er.C. Grissom recounted that the children were

---

[3] When he attempted to contact the owner of the apartments to request maintenance assistance, Taylor discovered that the apartments were in foreclosure and that many of the tenants did not pay rent. It was Taylor's opinion that appellants stayed at the apartment in deplorable conditions because they did not have to pay rent.

present in the home when J.C. attempted suicide and when J.C. assaulted Er.C. Additionally, the Department learned that J.C. "had panic attacks, anxiety, bipolar disorder and PTSD, that she also had postpartum depression and she was not on any type of medication or being consistent with MHMR" and that Er.C. "had seizures and he would zone out for 20 minutes at a time."[4]

In any event, when the caseworker went to visit appellants' apartment after the November 2013 report, she discovered one of the children naked and playing in feces in the room with the broken door. Photographs of the room indicated that feces had been smeared on the back of the door to the room and the wall and that it had not been cleaned. Another child was found lying in his bed with "milk all over his face, and it looked like his diaper was soggy wet." The caseworker believed that the children had been left unsupervised for a long time while Er.C. was playing video games. Grissom also recalled that one inspection of the apartment showed that appellants had one piece of cake to eat, no baby items, and no baby clothes for the children. Furthermore, doctors determined that D.C. "was delayed in his speech and motor skills."

The Department later discovered that Er.C. has a CPS history in Pennsylvania, which resulted in children being removed from his custody. The children in this case were removed and placed with appellants' friends, the Schulteas. However, the

---

[4] On cross-examination, J.C. testified that her doctor has since stated that she suffers from abandonment issues, rather than PTSD.

Department removed the children from the custody of the Schulteas upon receiving a tip that Mark Schultea had allegedly viewed child pornography.

J.C. admitted that she was incarcerated for the assault on Er.C. because she had violated the terms of her community supervision pertaining to a prior conviction for forgery. In particular, J.C. noted that she had prior convictions for theft, assault, and forgery. J.C. acknowledged that she has been arrested more than five times and that MHMR would not take her because she was unwilling to take medication. She also testified that the police had been called to the apartment on two other occasions for domestic disputes between her and Er.C. Additionally, J.C. stated that: (1) she had not complied with the terms of her community supervision and the terms of the service plan for the children; and (2) she had given Er.C. a black eye when she was pregnant with D.C. J.C. also testified about violent encounters she had with previous boyfriends, including one incident where J.C. threw a knife into a curtain. J.C. admitted that one of her prior boyfriends was convicted of child molestation. J.C. also recounted that she does not have custody of two other children of hers. J.C. tried to blame the deplorable condition of the apartment on a roommate they had taken in and on the numerous dogs and cats that resided there; however, she later acknowledged that the apartment "got that way because we all got lazy . . . . It was pure—pure laziness and I wish I could go back and not get that way." According to J.C., the trash had accumulated for many days. And when asked about the family's finances, J.C. testified that the roommate helped pay utilities; that they

did not have to pay rent for the apartment; that she is behind in paying her probation fees, restitution, and court costs; and that she is not paying court-ordered child support for her two other children.

Eventually, the apartments were foreclosed upon and the family was forced to move. J.C. stated that the family moved three times within a year and that she would be homeless if the family was not able to move in with friends. J.C. later testified that one of the children has a speech problem and has all of his top teeth capped. She also admitted that her parenting before the removal of the children "[w]as okay. I wouldn't say adequate." Despite sporadic prior employment, both J.C. and Er.C. now work forty-two hours over a two-week period for Voter Consumer Research. J.C. alleges that she is taking classes for medical coding and billing. To date, she has finished one class. Nevertheless, the family is unable to save money and depends on friends for rent and bills. J.C. has received student loans in the past for school, but she used some of the money to support the children and herself. Additionally, J.C. has asked CPS for money to pay bills and rent.

Chantel Williams, a worker for the Department in Bryan, observed visitations that Er.C. and J.C. had with the children. On one visit, Williams saw the following:

> As I was monitoring, the father was sitting with his back towards the visitation window where we can look into the room. And he was flipping through his phone and there were nude pictures in there of various different women. And the mother asked what he was doing, and he stated that he was trying to delete pictures off his SIM card so he could take pictures of the children.

Williams saw Er.C. delete one picture, take one picture of the children, and continue scrolling through the pictures of the nude women. Williams opined that Er.C.'s focus during the visit was on the pictures of the nude women, not his children.

Also included in the record is a letter that Mark Schultea sent to Oscar Davenport, J.C.'s probation officer. Notwithstanding the numerous errors in grammar, punctuation, and capitalization, the letter stated the following, in relevant part:

> I have known [J.C.] now for 8 years and in that time I have tried to help her get her life straight. . in that time she has played games and played my wife and friends for time and money and her drama. . sometime on march we had a fallout. She wanted to leave her husband cause he was being an ass, the next day she went back to him after she was physically assaulted by him . . there was a police contact but no supporting evidence to make an arrest. how ever I have a witness to the event. I am aware that she currently owe money to court and probation. and the court as of 4/19 as requested a capias warrant for her due to nonpayment. she told my wife and I that you told her not to worry about paying the courts and to only pay her probation.
>
> As far as [J.C.'s] money issues. She has been attending Stratford online College for a year now. . and every 8-10 weeks she has received a check for Student aid in the amounts of $1100-1400. she received $1522.00 on March 25th so her excuses to you about not able to make and pay her fees is a lie. they got there Tax Refund on 2/25/13 in the amount of $2931.00. while they were in Pennsylvania they went only and got 2 payday loans one for $200 and one for $60. they were not working at this time. so less than 30 days ago they had over $4400. she told me that upon going to PA in Dec she had to pay $1000 to probation, I found out later she never did. and yet she paid little or nothing to Brazos County Court or your office. her husband is the big factor in this. . he controls her and tells her what to do. she told us one time she was planning to pay her fees and he told her no. Jan. 2013 [Er.C.] got burned in a grease fire at home, the doctors in Galveston burn unit released him to return to work in March 2013. he has not returned to work and has not attempted to pursue any job. there

roommate is the only one providing money by donating plasma for diapers for there son. I am on the verge of calling CPS and filing a case on the neglect care of there son. . . . there lease on there apt ends 5/31/13 the property has been foreclosed on the owner and the bank has told them to be out by 5/31/13. they have not made arrangements to relocated to another residence in B/CS. the only money they have been getting is from Both of there School checks cause he started at Stratford College 4 months ago. . in the last 4 months they have spent thousands of dollars .all there doing is collecting the money and not pursuing an education.

In the last 6 weeks I have discovered [J.C.] has been actively using online services via webcam on a sex website exposing herself in a sexual nature and earning money for her acts. I believe that to be a form of online prostitution act. she has collected 187$ from this sex business. Both there bank account has reflected many transactions of this sex website and shows deposits from that site. they also have been buy random merchandise and buying cellphones, the last time they went to PA they purchases bus tickets in the amount of 500 dollars. I fine this interesting that she stresses how she cant make her payments but they can spend money like there's no tomorrow. they spent $444.94 on myfreecams.com which is the web site she does this on between 3/29-4/2. April 1st he got a cellphone for 146.54 at bestbuy. I know form everything I have told you in this email seems odd and perhaps non supported, I can provide bank records of transactions, and can reference this sex website with her profile. I also was informed that [Er.C.] and his roommate have been going to the Northgate bars every Friday. again yet no jobs no money, but they can afford to drink, in reference to that, I was informed by [J.C.] herself before we stopped talking that while she was visiting up north in Dec 2012. she was drinking and received 2 citations for Drunk and Disorderly, which she still owes money to. I'm not surprised there's a warrant on that too. I know from all of this it looks like I'm trying to destroy her life, but I and several others have always tried to hope for the best for her, she thinks life is a game and doesn't take anything seriously and lets her husband control her. . . . I would gladly help her again, but my conditions would be that she would have to file divorce on [Er.C.] other wise I have no interest. but since I found about her possible plans to flees the state I figure it was only right for you to know.

In closing id advise you to please sir to get her attention and advise her shes heading for trouble. . and also I must ask that you not reveal to [J.C.] and [Er.C.] how you obtained this information. cause [Er.C.] has told

several people that if we ever fucked with them ever again he would kill us both and anyone who tried to interfere. [Er.C.] is hot headed and violent and he has threatened me in person but Bryan PD would not act on it.

Schultea testified that appellants and the children have lived at his residence several times and that appellants have contributed towards rent. Appellants are on food stamps and have paid some of the Schulteas' share of the utilities because Schultea took another job that apparently does not pay as much as his previous job. Schultea is searching for a second job to supplement his income and his wife's disability check. In subsequent testimony, Schultea contradicted his letter by stating that he did not believe that Er.C. controlled J.C. or that Er.C. would get violent. He also believes that appellants' relationship has improved and that their situation is more stable for the children. However, Schultea testified that it is concerning that appellants are dependent upon his family to pay half the rent, some of the utilities, and for transportation, especially considering the volatility of their relationships. And on cross-examination, Schultea agreed that appellants' prior living situation was disgusting, dangerous to the children, and neglectful. Schultea also testified that he shares his mother's car with appellants and his wife and that his mother has threatened to take the car away in the past.

Michael Muneme, a friend that appellants met through a video-game group, stated that appellants' apartment was in "severe disarray." Muneme later noted that appellants spent two to three hours at a time playing video games and that membership in the video-game group was $20 annually.

Er.C. testified to the following:

I'm not going to throw anybody under the bus, though. I feel that we all should have had a hand in keeping up on the place. I feel that we all dropped the ball pretty badly on that one. I won't lie and say that I had nothing to do with it because I did. The thing is . . . I learned from that mistake.

Er.C. admitted to dropping the ball again while J.C. was in jail, though he blamed the deplorable conditions on depression and his coping skills.

The testimony above depicts not only a single episode of endangerment, but also a pattern of appellants' inability to provide safe and stable living conditions for their children. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("[C]onduct that subjects a child to a life of uncertainty and instability . . . endangers the physical and emotional well-being of a child."). In addition, the record reflects that appellants have violently interacted with one another or others or made violent threats prior to having children and while the children were nearby. *See In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied) (noting that violent or abusive conduct by someone within the household is an environment that endangers children); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) (stating that abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child); *In re B.J.B.*, 546 S.W.2d 674, 677 (Tex. Civ. App.—Texarkana 1977, writ ref'd n.r.e.) (stating that domestic violence, want of self-control, and propensity for

violence may be considered as evidence of endangerment); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("It necessarily follows that the endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children . . . ."); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (stating that the endangering conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed"); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied) ("Evidence of past misconduct or neglect can be used to measure a parent's future conduct."). Furthermore, J.C. admitted that she had tried to commit suicide before her arrest for assaulting Er.C—an act that also supports an endangerment finding. *In re J.T.G.*, 121 S.W.3d at 126 (stating that a parent's mental instability and attempt to commit suicide may contribute to a finding that the parent engaged in conduct that endangered a child's physical or emotional well-being); *see In re A.M.C.*, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (upholding a jury's determination of endangerment where the evidence showed that the mother's suicidal thoughts, suicide attempts, and neglect).

Therefore, viewing the evidence in the light most favorable to the judgment, we conclude that a reasonable factfinder could form a firm belief or conviction that appellants "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* TEX. FAM. CODE ANN. § 161.001(1)(D); *see also In re J.P.B.*, 180 S.W.3d at 573. Moreover, in

light of the entire record, we conclude that the evidence supporting termination with respect to subsection (D) is also factually sufficient. *See* TEX. FAM. CODE ANN. § 161.001(1)(D); *see also In re H.R.M.*, 209 S.W.3d at 108.

We also believe that the evidence establishes a course of endangering conduct that is required under subsection (E). *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Accordingly, we also conclude that the evidence is legally and factually sufficient to establish termination under subsection (E). *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *see also In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). And to the extent that appellants argued in the trial court that they have improved their situation so as to stave off termination, we emphasize that evidence of recent improvement does not absolve the parent of a history of irresponsible choices. *See Smith v. Tex. Dep't of Protective & Reg. Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.); *see also In re I.R.K.-N.*, No. 10-13-00455-CV, 2014 Tex. App. LEXIS 5310, at *20 (Tex. App.—Waco May 15, 2014, pet. denied) (mem. op.). We overrule appellants' first issue.

## II. STANDING

In their second issue, appellants contend that the Barretts, the foster family, did not have standing to intervene in the suit involving A.C.

## A.     Standard of Review

Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). Standing is implicit in the concept of subject-matter jurisdiction. *Id.* Whether a party has standing to maintain a suit is a question of law. *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002); *In re A.J.L.*, 108 S.W.3d 414, 419 (Tex. App.—Fort Worth 2003, pet. denied). The pleader bears the burden of alleging facts that affirmatively demonstrates the court's jurisdiction to hear the cause. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. In our review of standing, an appellate court take the factual allegations in the petition as true and construes them in favor of the pleader. *Juarez v. Tex. Ass'n of Sporting Officials, El Paso Chapter*, 172 S.W.3d 274, 278 (Tex. App.—El Paso 2005, no pet.) (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446). Besides the pleadings, an appellate court may also consider relevant evidence and must do so when necessary to resolve the jurisdictional issues raised. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

Standing to sue may be predicated upon either statutory or common-law authority. *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 850 (Tex. App.—Fort Worth 2005, no pet.). When standing has been statutorily conferred, the statute itself serves as the proper framework for a standing analysis. *Id.* at 851. Standing to bring a suit affecting

the parent-child relationship is governed by the family code. *In re McDaniel*, 408 S.W.3d 389, 397 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding).

## B.     Applicable Law

In determining whether the trial court improperly denied appellants' motion to strike the Barretts' petition to intervene, we must decide if the trial court abused its discretion. *See Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990); *In re N.L.G.*, 238 S.W.3d 828, 829 (Tex. App.—Fort Worth 2007, no pet.) (per curiam). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or if it acts in an arbitrary or unreasonable manner. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).

As a general rule, an individual's standing to intervene is commensurate with that individual's standing to file an original lawsuit. *Whitworth v. Whitworth*, 222 S.W.3d 616, 621 (Tex. App.—Houston [1st Dist.] 2007, no pet.). A party's standing to file an original suit affecting the parent-child relationship is typically governed by sections 102.003 (general standing), 102.004, and 102.005 (additional standing for others) of the Texas Family Code. *See* TEX. FAM. CODE ANN. §§ 102.003-.005 (West 2014).

## C.     Discussion

In the case involving D.C. and E.C., the Barretts filed a petition to intervene, asserting standing under section 102.003(a)(12) of the Texas Family Code, which provides that "a person who is the foster parent of a child placed by the Department of Family and

Protective Services in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition" may file an original suit. *See id.* § 102.003(a)(12). The Barretts' petition in the case involving D.C. and E.C. stated that the children had resided with them since November 21, 2013. No challenge was made to this petition.

With respect to A.C., the Barretts argued that they have standing as to A.C. because the child has resided with them "since his birth on August 24, 2014 and Intervenors have been allowed to intervene in the companion case, Cause No. 13-002954-CV-272 affecting the child's brothers. The cases have identical parties and facts and will be tried together on May 12, 2015." Appellants moved to strike this petition because the Barretts,

> could not have brought this suit on their own as they have not been the TDFPS foster placement for [A.C.] for at least 12 months. As it is apparent the only interest alleged is to adopt this child if termination is granted, Respondents assert this is not sufficient standing to entitle the BARRETTS to intervene in this suit.

At the hearing on appellants' motion to strike, the Barretts argued that pursuant to section 102.005(4) and (5) of the Texas Family Code, they have standing as to A.C. *See id.* § 102.005(4)-(5). At the conclusion of the hearing, the trial court allowed the Barretts to intervene.

Section 102.005 provides the following, in relevant part:

An original suit requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption may be filed by:

> (4) an adult who has adopted, or is the foster parent of and has petitioned to adopt, a sibling of the child; or

> (5) another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so.

*Id.* § 102.005(4)-(5).

As shown above, A.C. was born on August 24, 2014; the Barretts have had custody of A.C. since birth; and trial commenced as to all of the children on May 12, 2015. This means that A.C. had been in the care of the Barretts for approximately nine months prior to trial. This is enough to show that the Barretts had substantial past contact with A.C. within the context of 102.005(5) of the Texas Family Code. *See id.*; *In re A.B.*, 412 S.W.3d 588, 608 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014) (noting that there is "[s]ound policy support[ing] the relaxed standing requirements" because allowing persons with "substantial past contact" to intervene may "enhance the trial court's ability to adjudicate the cause in the best interest of the child") (quoting *In re N.L.G.*, 238 S.W.3d at 830[5]; *In re C.M.C.*, 192 S.W.3d 866, 870-72 (Tex. App.—Texarkana 2006, no pet.)

---

[5] Specifically, the Fort Worth Court of Appeals emphasized the following:

Sound policy supports the relaxed standing requirements. *In re K.T.*, 21 S.W.3d 925, 927 (Tex. App.—Beaumont 2000, no pet.). There is a significant difference between filing a suit which could disrupt the children's relationship with their parents, and intervening in a pending suit, where the relationship is already disrupted. *Whitworth v. Whitworth*, 222 S.W.3d 616, 621-22 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In the latter case,

(defining "substantial" as "of ample or considerable amount, quantity, size, etc."); *see also In re D.A.*, No. 02-14-00265-CV, 2015 Tex. App. LEXIS 1150, at **8-9 (Tex. App.—Fort Worth Feb. 5, 2015, no pet.) (mem. op.) (concluding that a grandmother established "substantial past contact" under section 102.005(5) when the record showed that the child had lived with her for approximately three of his then-ten years and had lived with her for about 75% of two other years); *In re M.J.R.B.*, No. 12-11-00004-CV, 2012 Tex. App. LEXIS 8249, at **4-6 **(**Tex. App.—Tyler Sept. 28, 2012, no pet.) (mem. op.) (concluding that a couple had standing to file a termination petition under section 102.005(5) when the evidence demonstrated that the child had been in their care for seven months prior to trial).

It also appears that the trial court could have allowed the Barretts to intervene under section 102.004(b) of the Texas Family Code, which provides that the trial court,

> may grant a grandparent or other person deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this subchapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

---

intervention may enhance the trial court's ability to adjudicate the cause in the best interest of the child. *Id.*

*In re N.L.G.*, 238 S.W.3d 828, 830 (Tex. App.—Fort Worth 2007, no pet.) (per curiam).

*See* TEX. FAM. CODE ANN. §102.004(b) (West 2014); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (stating that it is the duty of the appellate court to uphold the trial court's judgment on any theory of law applicable to the case, once the review of the record shows fact findings supported by the evidence); *see also In re N.E.*, No. 2-04-366-CV, 2005 Tex. App. LEXIS 5544, at **3-4 (Tex. App.—Fort Worth July 14, 2005, no pet.) (mem. op.). This is especially true given that we believe that the record shows substantial past contact between the Barretts and A.C. and that the actions of appellants would significantly impair the child's physical health and emotional development.

Regardless, based on the foregoing, we cannot say that the trial court abused its discretion in granting the Barretts' petition to intervene and implicitly denying appellants' motion to strike the Barretts' petition to intervene as to A.C. *See Guar. Fed. Sav. Bank*, 793 S.W.2d at 657; *see also In re N.L.G.*, 238 S.W.3d at 829. Accordingly, we overrule appellants' second issue.

### III.  CONCLUSION

Having overruled all of appellants' issues on appeal, we affirm the judgment of the trial court.


AL SCOGGINS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
(Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed October 22, 2015
[CV06]

*(Chief Justice Gray concurs with the following note. There is a certain symmetry to grounds D and E regarding whether a single act or a course-of-conduct is required. I believe the symmetry to be that depending on the facts of a given case a single act can support termination under either section D or E and that neither necessarily require a course-of-conduct to support termination. I have been unable to find a case that would have turned on such an analysis by which I am bound, including this one. It is clear that this is not one because both D and E grounds have overwhelming support of a course-of-conduct in the evidence that supports termination.)

